UNITED STATES v. EGAN *et al.*

*(District Court, D. Minnesota, Third Division. July 9, 1891.)*

**INTERSTATE COMMERCE—LIMITED TICKETS.**
    Where a railroad company has advertised one rate for unlimited first-class tickets between certain points and a less rate for limited first-class tickets between such points, it may sell at the latter rate tickets which, though not limited as to time of use, do not entitle the holder to the right to stop over at intermediate stations, as is allowed under the unlimited tickets, since the requirement that the ticket shall be used only for a continuous passage renders it a "limited ticket."

At Law.

This is an indictment for an alleged violation of certain provisions of the interstate commerce act, in selling tickets at less than the rates scheduled, published, and posted in the proper places, and filed with the interstate commerce commission. The indictment consists of four counts, the second and fourth of which are merely formal. The first count, omitting the preliminary averments, is as follows:

"That on the said 12th day of March, A. D. 1890, John M. Egan was general manager of said railway company and Charles H. Holdridge was general agent of the passenger department of said railway company. That on said day said Chicago, Saint Paul, and Kansas City Railway Company had established a certain rate, fare, and charge for the first-class unlimited transportation of passengers from the said cities of Minneapolis and Saint Paul to said city of Chicago, which said rate, fare, and charge had been duly published and was in force on said day, and has been ever since. A copy of the schedule showing said rate, fare, and charge established as aforesaid had been duly filed by said common carrier and railway company with the interstate commerce commission, created by the act of congress as aforesaid. That said rate, fare, and charge for said transportation of passengers from said cities of Minneapolis and Saint Paul to said city of Chicago as aforesaid, as established by said railway company as aforesaid, and duly published, and a copy of said schedule filed with said interstate commission was eleven dollars and fifty cents ($11.50) for each passenger for first-class unlimited transportation from each of said cities of Minneapolis and Saint Paul to said city of Chicago as aforesaid. That said rate, fare, and charge of eleven dollars and fifty cents ($11.50) for each passenger was the legal rate, fare, and charge which said common carrier and railway company as aforesaid, or any director, officer, of agent thereof, or any person acting for or employed by said common carrier and railway company, could legally charge, demand, collect, and receive from

any person or persons for first-class unlimited transportation over said line of railway from either of said cities of Minneapolis and St. Paul to said city of Chicago as aforesaid, on said date or at any date subsequent thereto, and was the only rate, fare, or charge which said common carrier, the railway company as aforesaid, or any director, officer, or agent thereof, or person acting for or employed by them, could legally charge, demand, collect, and receive from any person or persons for first-class unlimited transportation of passengers over said line of railway from said cities of Minneapolis or St. Paul. That on said 12th day of March, A. D. 1890, the said John M. Egan and the said Charles H. Holdridge were then and there officers and agents of and persons acting for and employed by said common carrier and railway company, and that the said Egan and the said Holdridge, acting as such officers and agents and persons acting for and employed by said common carrier and railway company as aforesaid, did at the city of Saint Paul, in the district of Minnesota, and within the jurisdiction of this court, on the said 12th day of March, then and there feloniously, unlawfully, and willfully cause to be transported, and willingly, willfully, knowingly, and unlawfully suffer and permit to be transported, over said line of said common carrier and railway company as aforesaid, a large number of passengers, to-wit, one thousand passengers, upon first-class unlimited tickets, (the names of said passengers, and each of them, are unknown to the said grand jurors,) from said city of Saint Paul, in the state of Minnesota, to said city of Chicago, in the state of Illinois, as aforesaid, at and for a less rate, fare, and charge than eleven dollars and fifty cents, ($11.50,) the legal rate as aforesaid, to-wit, at and for the rate, fare, and charge of seven dollars, ($7.00,) and that they, the said Egan and the said Holdridge, acting as said officers, agents, and persons acting for and employed by said common carrier and railway company as aforesaid, did then and there willfully, knowingly, and unlawfully charge, demand, collect, and receive a less rate, fare, and charge for transportation from said city of Saint Paul, in the state of Minnesota, to the said city of Chicago, in the state of Illinois, a less rate, fare, and charge from each of said passengers, whose names are to said jurors unknown as aforesaid, than eleven dollars and fifty cents, ($11.50,) to-wit, seven dollars, ($7.00,) for the transportation of each of the said passengers from said city of Saint Paul to the said city of Chicago, which said charge of seven dollars ($7.00) then and there demanded, collected, and received as aforesaid by the said Egan and the said Holdridge, as aforesaid, was less than the compensation specified as aforesaid in the said schedule of rate, fare, and charge established by said railway company, and in force on the said 12th day of March, A. D. 1890, for first-class unlimited transportation from said city of Saint Paul to said city of Chicago, and filed with the interstate commerce commission as aforesaid."

The third count charges as follows:

"That the said John M. Egan and the said Charles H. Holdridge did on the said 12th day of March, A. D. 1890, then and there feloniously, unlawfully, and willfully make an arrangement, agreement, and contract with one Charles H. Petsch, of said city of Saint Paul, for and on behalf of said common carrier, the Chicago, Saint Paul, and Kansas City Railway Company, to furnish to the said Charles H. Petsch five thousand (5,000) tickets, each good for one first-class passage and transportation from the city of Minneapolis or the city of Saint Paul, in the state of Minnesota, to the city of Chicago, in the state of Illinois, and that the said Egan and the said Holdridge did on the said day unlawfully, willingly, and willfully furnish, give, and deliver to the said Charles H. Petsch said tickets, by which said tickets they did unlawfully, willingly, and willfully agree for and on behalf of the said common carrier and railway company to transport one passenger on each of said tickets from

either the city of Minneapolis or the city of Saint Paul, in the state of Minnesota, to the city of Chicago, in the state of Illinois, over said line of railway. That the said Egan and the said Holdridge, acting as said officers, agents, and persons acting for and employed by the said common carrier and railway company, did then and there unlawfully, willingly, and willfully charge, demand, collect, and receive from said Charles H. Petsch, the rate, fare, charge, and amount of seven dollars ($7.00) for each of said tickets, which said rate, fare, charge, and amount is less than the rate, fare, and charge established by said railway company as aforesaid, and duly published and filed with said interstate commerce commission as aforesaid."

It was admitted by defendants' counsel—

(1) That at the time in question the defendants were officials of the Chicago, St. Paul & Kansas City Railway Company, as stated in the indictment.

(2) That the said railway company duly issued, posted in its depots, and filed with the interstate commerce commission, a certain passenger rate schedule, to take effect the 4th of March, 1890, by which rates between St. Paul and Chicago were established and published as follows: First-class unlimited tickets, $11.50; first-class limited tickets, $7, limit one day, which it was conceded applied only to limited tickets.

(3) That the tickets sold as first-class unlimited tickets were of the form "A," and the 5,000 tickets in question were of the form "B," herewith exhibited:

A.

B.

| Day | 2 | 4 | 6 | 8 | 10 | 12 | 14 | 16 | 18 | 20 | 22 | 24 | 26 | 28 | 30 | JAN. | FEB. |
|-----|---|---|---|---|----|----|----|----|----|----|----|----|----|----|----|------|------|
| 1 | 3 | 5 | 7 | 9 | 11 | 13 | 15 | 17 | 19 | 21 | 23 | 25 | 27 | 29 | 31 | MAR. | APR. |

CHICAGO, ST. PAUL & KANSAS CITY RY.

SPECIAL LIMITED TICKET.

| | MAY. | JUNE. |
|--|------|-------|
| | JULY. | AUG. |
| | SEPT. | OCT. |
| | NOV. | DEC. |

**MINNEAPOLIS or ST. PAUL**

—TO—

# CHICAGO.

This Ticket will not be accepted for passage after date cancelled in margin.

| 3649 | Form G. B. | *Gen'l Passenger & Ticket Agent.* |
|------|-----------|-----------------------------------|

| 1890 |
| 1891 |
| 1892 |
| 1893 |
| 1894 |
| 1895 |
| 1896 |

(4) That in March, 1890, and after said schedule rates went into effect, the defendant Charles H. Holdridge sold to one Charles Petsch 5,000 tickets of form "B," and said Petsch paid therefor the sum of $7 each, being $35,000, and that said tickets were not punched or canceled as to date in the margins thereof.

The testimony on the part of the defendants tended to show that the holder of an unlimited ticket was entitled to ride on the same from St. Paul to Chicago and to break his journey at as many different points as he elected, and to have his baggage checked to such stop-over points; and also that the holder of a limited ticket was entitled to ride from St. Paul to Chicago on the same, but was compelled to make a continuous journey between those points, without the privilege of breaking his journey at, or of checking his baggage to, any intermediate point. At the close of the testimony counsel for the government admitted that the sole question to be determined was whether tickets of form "B" were limited or unlimited tickets, and contended that in reality they were unlimited tickets; that the word "limited" related solely to the time within which the tickets would be honored by the company; that these tickets, having no punch-marks or cancellations to denote such limit of time, were practically "unlimited tickets," and as such entitled the holder to the enjoyment of all the privileges granted to the holder of a ticket of form "A," and were good for passage between Minneapolis or St. Paul and Chicago until used. Counsel for defendants insisted that the tickets were, as stated on their face, "limited tickets;" that they conformed to the schedule filed as of the price of $7 and were sold in accordance with the provisions of said schedule; and that the limit of the privilege of stop-over constituted them "limited tickets" within the meaning of the term.

*Eugene G. Hay,* for the United States.

*Lusk & Bunn* and *C. D. O'Brien,* for defendants.

THAYER, J. In the case of the United States against Egan and others the evidence shows that at the time of the alleged unlawful sale of 5,000 tickets complained of in the indictment, the Chicago, St. Paul & Kansas City Railway Company (of which company the defendants are the president and general passenger agent, respectively) had on sale and publicly advertised for sale two kinds of tickets from St. Paul to Chicago,—one class termed an "unlimited ticket," sold for $11.50; and the other a limited ticket, sold for $7. The published schedule, showing such rates, was on file with the interstate commerce commission, and was posted at the various stations and depots along the line of the road as required by law. These two classes of tickets, unlimited and limited, were accessible to every one who chose to buy them, so that there was no discrimination in the sale of either class of tickets. The government contends that the 5,000 tickets sold by the defendants at seven dollars each, were in reality unlimited tickets, and hence that the sixth section of the interstate commerce act was violated. The court is satisfied, however, from the uncontradicted evi-

dence in the case, that there was a difference in the tickets sold by the defendants, and those known and sold as unlimited first-class tickets. The latter class, under the rules and regulations of the company, entitled the holder to stop-over privileges, while under the undisputed evidence in the case the company had the right to insist that the holder of the tickets sold by the defendants as first-class limited tickets, should make a continuous passage. I think the railroad company had a right to insist upon a continuous journey when it was once undertaken by the holder of a limited ticket, even though the ticket was not punched in the margin so as to limit the period of use. The tickets sold by defendants were, therefore, in one sense limited tickets; that is to say, they were limited as to the privileges enjoyed by the holder, though not limited as to time of use.

Now, as the published schedules of rates did not specify what was meant by "first-class limited tickets," and as the interstate commerce commission did not see fit when the schedule was filed to require the company to explain what was meant by that term, or to what privileges the holder was entitled, no case has been made out, in my opinion, warranting the submission of the case to the jury. The evidence in my judgment would not support a conviction under any of the counts of this indictment. The railroad company in question advertised for sale, "limited first-class tickets" from St. Paul to Chicago for seven dollars, and the defendants have sold tickets between those points which were in fact limited as to privileges, by requiring a continuous journey to be made by the holder of the ticket, if the railroad company elected to enforce that requirement. It might have been in this sense that the term "limited" was used in the published schedules filed with the commission, and there is no sufficient evidence in the case that it was not so used. The difficulty encountered in this case could probably be remedied by requiring a railroad company when it files its rate schedule with the commission, to specify clearly in the schedule what is meant by the term "limited tickets," instead of leaving railroad companies to put their own construction on, and the public to speculate as to the meaning of, the term. The jury will be instructed to acquit the defendants on all of the counts in the indictment.